## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DR. JAMES ELIPAS, *et al.*,           )
                                      )
            Plaintiffs,               )
                                      )
            v.                        )      No. 07 C 3026
                                      )
JAMES K. JEDYNAK, B. GAIL HOWARD,     )
SCOTT H. CUMMINGS, *et al.*,          )
                                      )
            Defendants.               )


### MEMORANDUM OPINION

Before the court are: (1) the King Plaintiffs' motion for partial summary judgment against defendant Scott H. Cummings, and (2) the Elipas Plaintiffs' motion to join that motion.[1]  For the reasons explained below we grant the motion to join and deny the motion for summary judgment.

### BACKGROUND

The plaintiffs are former investors in Unified Worldwide Transport, LLC ("UWT"), a California limited liability company. They allege various state and federal securities law violations stemming from the defendants' alleged misstatements and omissions.

---

[1]  The "King Plaintiffs" consist of plaintiffs Brian A. King, Janice Migon, Rosa and Tony Perez, Andrew Bennett, Larry J. Liebovich Living Trust, Ronald Riegelhaupt, David Spinney, Joseph Lanzito, John Ohk, Adam and Dina Skinner, P&P Holdings, Inc. and Claddagh Holdings, Inc.  The King Plaintiffs intervened in this lawsuit approximately six months after it was originally filed by the "Elipas Plaintiffs:" James Elipas, Martha Ault, Wayne P. Endre, Katherine H. Endre, JS Squared, LLC, Cuzins Four, LLC, Lewis Carrozza, Ivo Cozzini, John Pavlopoulos, Thomas Pavlopoulos, and Dennis Pavlopoulos.

UWT was dismissed from this case shortly after it filed for bankruptcy in July 2007. In December 2008 several defendants, including James K. Jedynak and his company KKJ Holdings, LLC, consented to a $4 million judgment in favor of the plaintiffs. (See Order re Consent Judgment, dated December 1, 2008.) Jedynak initially participated in pleadings and discovery before later invoking his Fifth Amendment privilege against self-incrimination. (See Jedynak's Answer to the Elipas Plaintiffs' Second Amended Complaint, attached as Ex. 28 to Pl's Mot. for Summ. J.) Another key player in the alleged scheme, Betty Gail Howard, has also invoked her Fifth Amendment privilege. (See Pro Se Mot. to Stay Proceedings, dated April 30, 2008.) Howard, unlike Jedynak, never meaningfully participated in this litigation.[2] That leaves defendant Scott Cummings, a former UWT officer and equity holder, who is proceeding pro se in this matter. The plaintiffs seek summary judgment against Cummings on their claim for rescission under the Illinois Securities Act. (Am. Compl. ¶¶ 122-41 (Count II).)

### 1.    **UWT and Its "Predecessor" Entities**

Cummings states that he met Howard in July 2002, when she was employed by an entity called National Innovative Financial Technologies, Inc. ("NIFTI"). (Cummings Decl. ¶ 3; see also Pls.'

---

[2]/ The King Plaintiffs' unopposed motion for summary judgment as to Howard is currently pending before this court.

L.R. Stmt. ¶ 14 (stating that Howard was "associated" with NIFTI).)[3] Cummings invested in NIFTI, and through NIFTI two other companies: UWT-NV and Jetstream, LLC, a joint venture between NIFTI and a company called Presto Telecommunications. (Cummings Decl. ¶¶ 3-4 (stating that his NIFTI investments were earmarked for UWT-NV and Jetstream, which had some unspecified relationship with NIFTI).) UWT-NV and Jetstream were formed to develop and utilize "voice-over-IP" ("VOIP") technology for telecommunications between the United States and other countries. (Cummings Decl. ¶ 3.) The VOIP business, as distinct from NIFTI's core business involving credit cards, was Howard's brainchild. (Id.; see also Cummings Dep. at 20-22.) There does not appear to be any dispute that these entities lost money — Cummings' tax returns reflect "substantial operating losses from these entities." (See Def.'s Resp. to Pl.'s Stmt. ¶ 14; see also Cummings Dep. at 31.) But Cummings appears to take issue with the plaintiffs' assertion that these companies "failed." (Def.'s Resp. to Pl.'s Stmt. ¶ 14.) According to Cummings the operations of those companies were consolidated into a new entity (UWT) in June 2003, which then carried on the VOIP business. (See id.; see also Cummings Decl. ¶ 5 ("The purpose of creating UWT was to consolidate the various VOIP telecom business activities already initiated by Howard into a single entity.").)

---

[3] Mr. Cummings attached a lengthy, detailed declaration to his response. Plaintiffs have not responded to the declaration except to request that we strike certain statements as hearsay.

Specifically how this consolidation came about, whether by merger, sale or otherwise, is unclear. (<u>See</u> Cummings Dep. at 37-38 (stating that he was not aware of any formal transfer documents).) Cummings' investments in NIFTI, UWT-NV, and Jetstream — in the form of equity investment and loans — were reflected on UWT's books at its inception, making Cummings the new entity's largest equity holder and largest creditor. (Cummings Decl. ¶ 6; Pls.' Stmt. ¶¶ 17-18.) Cummings' loans were reflected in UWT's Operating Agreement as loans "to the Company" (i.e., UWT). (<u>See</u> Operating Agreement § 3.7; <u>see also</u> Cummings Decl. ¶ 8.) Cummings also contends that he contributed money to the predecessor entities that was used to purchase equipment in Mexico. (Cummings Dep. at 13-16.) That equipment was contributed to UWT, and the purchase is reflected in the Operating Agreement as a "Preferred Amount." (<u>See</u> Operating Agreement, § 2.1; Cummings Decl. ¶ 5.) The "Preference Owners," three entities controlled by Cummings, had priority over other equity holders in the proceeds derived from a "Sale," as defined in the agreement, up to the Preferred Amount. (<u>Id.</u> at §§ 2.1, 4.1.3, 5.1.4, Ex. A.) But a person reading the Operating Agreement would not know that the "loan" mentioned in § 3.7, or the "Preferred Amount" mentioned in § 2.1, related to investments that Cummings initially made in UWT's predecessors. (<u>See</u> Def.'s Resp. to Pls.' Stmt. ¶¶ 70, 75.) Nor are those entities mentioned by name anywhere else in the Operating Agreement. (<u>Id.</u>)

Two other aspects of UWT's formation are relevant to this case. First, Cummings contends that in 2003 UWT's attorneys "recommended that UWT take proactive steps to close out all NIFTI investors to prevent any future claims of ownership by NIFTI investors in UWT." (Cummings Decl. ¶ 9.) To that end the company entered into settlement agreements entitling those investors "to receive a return of their NIFTI investment." (Id.) Cummings attaches to his declaration a draft letter that was purportedly sent to these same investors giving them the option to "rollover their equity into NIFTI" on or before December 1, 2003. (See id.; see also Email & Attached Letter, dated Nov. 18, 2003, attached as Ex. 7 to Cummings Decl.) Cummings elected to cash out his NIFTI investment. (Cummings Decl. ¶ 9.) It appears that money raised during UWT's initial round of equity financing was used to fund these settlements, but it is unclear whether UWT had any remaining obligations under the agreements after January 2004. (See Minutes, dated January 8, 2004, attached as Ex. 38 to Pls.'s Stmt., at "Topic 5" (indicating that as of that date most of the payments had been made, and that the remaining payments would be made "within the week").) Cummings contends that he "was repeatedly assured by Howard that all investors in UWT were clearly informed by her or Jedynak that a portion of their investor funds would be used to satisfy these Settlement Agreements." (Cummings Decl. ¶¶ 9-10; see also Minutes, dated Jaunary 8, 2004, at "Topic 5" ("It was clearly

communicated to Mr. Jedynak that part of the proceeds received by UWT from this equity fund raising would be used to satisfy the Settlement Agreements signed in July, 2003, with NIFTI LLC and JetStream LLC investors."). He also cites the notes to UWT's financial statements for the year ending December 31, 2003, which clearly identify the amount of the "settlement expense" and articulate the basis for the settlements. (See UWT Financial Statements, as of Dec. 31, 2003, at 9.) Cummings contends that he "was told by Howard that Jedynak and all current investors were sent a copy of this" document. (Cummings Decl. ¶ 10.)

Plaintiffs also contend that the defendants, and Cummings in particular, failed to disclose material information about Presto Communications, Jetstream's joint-venture partner. According to plaintiffs, Presto Communications' president was "indicted for fraud for misrepresenting Mexican telecommunication licenses." (Id. at ¶ 16.) They further contend that Cummings knew of the "indictment" at the time that UWT was formed in June 2003. (Id. at ¶ 21.) To support these statements plaintiffs cite two Securities and Exchange Commission press releases concerning the Commission's civil enforcement action against Presto, its president, and related entities for federal securities fraud. (Id.) Jetstream is not mentioned in those documents, nor do plaintiffs contend that Jetstream participated in the fraud described therein. The press releases are dated January 2004 and September 2005, well after UWT

was formed. (See SEC Press Releases, attached as Exs. 33-34 to Pls.' Stmt.) The confusion seems to stem from Cummings' statement during his deposition that Howard told him, before June 2003, that Presto's president had been "arrested" and accused of fraud. (Cummings Dep. at 23-24.) There is no other evidence in the record indicating that this arrest and/or indictment actually took place.

### 2. Cummings' Role at UWT

From UWT's inception through its bankruptcy in 2007, Cummings and Howard were the sole members of the company's "Executive Committee," which was vested with "sole and complete charge and management of all the business and affairs of [UWT]." (Pls.' Stmt. ¶ 19.) By a separate "consulting agreement" Cummings agreed "to render financial, corporate, and strategic advisory services to the Company in connection with his position on the Executive Committee of UWT LLC." (Id. at ¶ 69.) Howard served as the company's president and CEO. (Id. at ¶ 9.) In the fall of 2003 Howard and Cummings retained Jedynak to solicit new investors in UWT. (Cummings Decl. ¶ 7; see also Pls.' Stmt. ¶ 63.)) Cummings contends that his direct contact with Jedynak thereafter was very limited. (Cummings Decl. ¶ 7.) And it appears to be undisputed that Cummings never had any face-to-face meetings with any of the plaintiffs. But it is also undisputed that Cummings was involved in many facets of the fund raising process, which went on continually from late 2003 through 2006. (See Cummings Dep. at 81

("[T]here was an ongoing money raising effort on the part of Jim Jedynak and Gail Howard starting in the fall through the course of 2006.").) He reviewed, approved, and executed UWT's Operating Agreement, and was made aware that the document would be provided to potential investors. (Pls.' Stmt. ¶ 42.) He executed an amendment to that agreement creating a new class of shares that were ultimately sold the plaintiffs in this case. (Id. at ¶ 43.) He admits that he "participated in and approved the decision to sell UWT Securities to outside investors." (Id. at ¶ 61.) He states that he reviewed the documents that were used to solicit new investors. (Cummings Decl. ¶ 8; see also id. (stating that the company's outside counsel vetted and approved these materials).) He attended Executive Committee meetings at which he was apprised of Jedynak's marketing efforts. (Id. at ¶¶ 44-45.) He and Howard "frequently" discussed soliciting investors, and on several occasions discussed marketing strategies in detail. (Id. at ¶ 51-54; see also id. at ¶ 65 ("Cummings spent a 'great deal of time' discussing with Gail Howard the various activities being conducted to raise money for UWT.").) And he "encouraged" Howard and Jedynak "to work on the securities offering and to obtain investors for UWT." (Id. at ¶ 64.)

### 3. Jedynak's and Howard's Fraud

Two of the King Plaintiffs (Andrew Bennett and Patrick Shannon) wrote checks payable to KKJ — Jedynak's company — based on

Howard's written assurance that the money would be transmitted "upon receipt" to UWT. (Id. at ¶¶ 27-28.) Another four plaintiffs made checks payable to KKJ, and it is reasonable to infer from the fact of those payments that they were made at Howard's or Jedynak's direction, either directly or indirectly.[4] Those checks were deposited in KKJ's bank account at Harris Trust & Savings Bank, but none of that money was ever transferred to UWT. (Id. at ¶ 31.) Instead, Jedynak diverted several million dollars for his personal use. (See, e.g., id. at ¶ 37 ($20,000 for a pool at Jedynak's residence); ¶ 38 ($837,302.49 for real estate in Idaho); and ¶ 39 ($18,500 for jewelry).) He also diverted money to Howard and to an entity under her control. (Id. at ¶ 40 (citing bank records indicating that Jedynak promptly transferred $675,000 to Howard after depositing plaintiff P&P Holdings' check).) Cummings, for his part, does not dispute that Jedynak and Howard committed fraud, but he denies that he had knowledge of it at the time. (Def.'s Resp. to Pls.' Stmt. ¶ 40; see also Cummings Decl. ¶ 14.)

## DISCUSSION

### A.  Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[4]  Those plaintiffs are Brian King, Janice Migon, David Spinney, and Joseph Lanzito.

P. 56(c)(2).  In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  See <u>Pitasi v. Gartner Group, Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

## B.   Notice of Recission

Section 13 of the Illinois Securities Law provides that "[e]very sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser," provided that appropriate notice is given "to each person from whom recovery will be sought."  <u>See</u> 815 ILCS 5/13(A) & (B).  That notice must be sent "by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable."  <u>Id.</u> at § 13(B).  Illinois courts have been "lenient in their interpretation of what constitutes knowledge of voidability."  <u>Reshal Associates, Inc. v. Long Grove Trading Co.</u>, 754 F.Supp. 1226, 1236 (N.D.Ill. 1990) (collecting cases).  But

plaintiffs still have the burden of establishing that their notice was timely.  The Elipas Plaintiffs have not cited any evidence that they have satisfied this requirement, and it is not our role to comb the record for evidence to make their case for them.  See Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1001 (7th Cir. 2004).  This is a sufficient basis to deny their motion for summary judgment.  The King Plaintiffs cite letters that their attorney sent to Cummings, dated February 26, 2008, notifying him of their intent to rescind the sales and indicating that they "recently learned of the existence of a cause of action against you." (See Letters, dated February 26, 2008, attached as Ex. 47 to Pls.' Stmt.)  They also cite the allegations in their complaint concerning notice.  (Am. Compl. ¶¶ 138-40.)  Although the plaintiffs do not make this argument expressly, we gather that we are to infer from the phrase "recently learned" that plaintiffs' notifications were timely. (Cummings, appropriately enough, states that he does not know whether the notices were timely. (See Def.'s Resp. to Pl.'s Stmt. ¶ 76; Cummings' Answer ¶¶ 138-40.))  This is plaintiffs' motion for summary judgment and as such they do not get the benefit of such inferences.  Plaintiffs must come forward with some evidence of when they first learned that the sales were voidable.  See, e.g., Gowdy v. Richter, 314 N.E.2d 549, 556-57 (Ill. App. 1974) (concluding that notice of rescission was timely based upon the testimony of the plaintiff and his attorney).  There are, however, more fundamental problems with their motion.

## C.  Control Person Liability

Plaintiffs contend that Cummings is a "controlling person . . . by or on behalf of whom" the challenged sales were made.  See 815 ILCS 5/13(A).  As applied to "unincorporated issuers" — UWT is a limited liability company — "'controlling person' means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security, who directly or indirectly controls the activities of the issuer." 815 ILCS 5/2.4. "[A] controlling person need not always take overt action, but 'there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group in selling securities, before an individual will be held liable for the actions of the controlling group.'" Seibt v. Peterson, 609 F.Supp. 990, 991 (N.D. Ill. 1985) (quoting Froehlich v. Matz, 417 N.E.2d 183, 190 (Ill. App. 1981)).  "Some connection with the sale, or decision to sell, securities is required under the statute." Froehlich, 417 N.E.2d at 190.[5]

Cummings did not personally solicit investors, but he did generally support and encourage Jedynak's and Howard's fund raising efforts.  See Jacobs v. James, 574 N.E.2d 1292, 1296 (Ill. App. 1991) ("For Meiners to be liable as a controlling person, it is not necessary that he personally solicit plaintiffs to buy the

---

[5]  We disagree with plaintiffs that Cummings "concedes" that the "participation" requirement is satisfied.  (Pls.' Reply at 2.)  He cites the wrong legal standard in his response memorandum, but his declaration contains many factual assertions relevant to this question (assertions that plaintiffs largely ignore).

debentures."); see also Froehlich, 417 N.E.2d at 194 (similar). In several instances he provided specific input to Howard (and indirectly to Jedynak) concerning their efforts to sell UWT equity. And he benefitted personally from those sales insofar as the proceeds were used to pay his consulting fees and to repay the debt UWT owed him and entities under his control. See Froelich, 417 N.E.2d at 194 (finding control-person liability where the defendant concurred in the sale of unregistered securities and benefitted thereby). Plaintiffs argue that these facts render Cummings liable as a control person for Howard's and Jedynak's fraud. (Pl.'s Mem. at 12.) In their complaint plaintiffs' alleged that UWT's offering materials were riddled with false statements concerning the company's performance. (Am. Compl. ¶ 47.) It is undisputed that Cummings reviewed and approved those documents, although he now contends that he was acting on counsel's advice. (Cummings Decl. ¶ 8.) In any event, plaintiffs do not base their summary judgment motion on any false statements in the offering documents. The fraud as described in plaintiffs' summary-judgment materials is narrower: Howard and Jedynak falsely told investors that the money they paid to KKJ would be transmitted to UWT in order to develop that company's business. Instead, they used those funds for their own benefit. It appears, however, that Howard and Jedynak were reselling their own UWT equity. (See Member's Contrib. as of December 20, 2005, attached as Ex. 15 to Cummings Decl. (showing sales between KKJ and an entity owned by Howard, and "resales" to

some of the King Plaintiffs).)[6]  Those transfers — as distinct from
sales of new equity in the company — required Executive Committee
approval.  (See Operating Agmt. ¶ 7.1.1 ("Subject to Section 7.1.4
[involving transfers to family members], no Holder may Transfer all
or any portion of its Interest to any Person without the prior
written consent of the Executive Committee.").  Cummings contends
that the Executive Committee did not approve of those transactions,
(Cummings Decl. ¶ 16), and plaintiffs have not cited any contrary
evidence.  The fact that Cummings encouraged Howard and Jedynak to
sell interests in UWT does not necessarily show that he even
tacitly approved of secondary-market sales that did not benefit him
or the company in any way.  Plaintiffs have failed to show that
there is no genuine dispute of fact as to whether Cummings "acted
in concert" with Howard and Jedynak to make these sales.

## C.    **Primary Violations**

The Illinois Securities Act makes it illegal "[t]o obtain
money or property through the sale of securities by means of any
untrue statement of a material fact or any omission to state a
material fact necessary in order to make the statements made, in
the light of the circumstances under which they were made, not
misleading."  815 ILCS 5/12(G).  Accordingly, the plaintiffs must
show at a minimum that Cummings (1) "made a misstatement or

---

[6] Plaintiffs alleged as much in their complaint.  (See Am. Compl. ¶ 90
("The Offering Documents failed to disclose that some of the investors were
purchasing UWT securities in the secondary market instead of directly from
UWT.").)

omission, (2) of material fact, (3) in connection with the purchase
or sale of securities," (4) "upon which the plaintiff[s] relied."
See <u>Tirapelli v. Advanced Equities, Inc.</u>, 813 N.E.2d 1138, 1142
(Ill. App. 2004).  The <u>Tirapelli</u> court, relying on cases construing
Rule 10b-5, listed as an additional element what is commonly
referred to in securities cases as "loss causation."  <u>Id.</u>
(requiring the plaintiff to show that the defendant's material
misstatement or omission proximately caused the plaintiff's
injury).[7]  It appears that only one Illinois court has discussed
this requirement in any detail, and that court concluded that "loss
causation" is not an element of a claim under § 12(G).  See <u>Lucas</u>,
671 N.E.2d at 398-400.  We predict that the Illinois Supreme Court
would rule likewise.  See <u>Holmes v. Village of Hoffman Estate</u>, 511
F.3d 673, 683 (7th Cir. 2007) (a federal court applying Illinois
law must, "where there are gaps in the pertinent case law,"
"predict what the Illinois Supreme Court would hold").  Cummings
mistakenly, though not unreasonably, asserts that the plaintiffs
must also prove that he acted with scienter.  See <u>Morlock v.
Shepherd</u>, No. 99-C-0637, 1999 WL 1212197, *5 (N.D. Ill. Dec. 16,
1999) (suggesting, without explicitly holding, that the elements of
a claim under §§ 12(G) mirror the elements of a claim under Rule
10b-5).  In <u>Foster v. Alex</u>, 572 N.E.2d 1242, 1245 (Ill. App. 1991)

---

[7]  This is distinct from "transaction causation," which "concerns whether
the alleged misconduct induced the plaintiff to purchase the security in the
first instance."  See <u>Lucas v. Downtown Greenville Investors L.P.</u>, 671 N.E.2d
389, 398 (Ill. App. 1996).  Transaction causation is an element of a claim under
§ 12(G).  <u>Id.</u>

the court noted that §§ 12(F) and (G) are modeled on §§ 17(a)(2) and (3) of the Securities Act of 1933. Because those federal provisions do not require scienter, the <u>Foster</u> court held that neither do §§ 12(F) and (G). <u>Id.</u> (citing <u>Aaron v. Securities & Exchange Comm'n</u>, 446 U.S. 680, 697 (1980)).[8]

Plaintiffs contend that Cummings failed to disclose: (1) the existence of the predecessor entities; (2) the fraud perpetrated by Presto Telecommunications; (3) the settlement agreements with the predecessor entities' investors; and (4) Cummings' loans to the predecessor entities. Whether a statement or omission is "material" is a "fact-specific" inquiry, and "close cases should not be resolved by summary judgment." <u>Wielgos v. Commonwealth Edison Co.</u>, 892 F.2d 509, 517 (7th Cir. 1989); <u>see also</u> <u>Lucas</u>, 671 N.E.2d at 395 ("Materiality is a mixed question of law and fact which is ordinarily left for the jury to determine."). "Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 450 (1976) (citations and internal quotation marks omitted). Plaintiffs argue that each of Cummings' omissions is material, but they provide very little relevant

---

[8] <u>See also</u> <u>People v. Whitlow</u>, 433 N.E.2d 629, 634 (Ill. 1982) ("[C]ulpability is not required to sustain a conviction under" §§ 12(F) & (G)); <u>Zahorik v. Smith Barney, Harris Upham & Co.</u>, No. 86 C 3638, 1987 WL 11438, * (N.D. Ill. May 14, 1987) (applying <u>Whitlow</u> in a civil case under §§ 12(F) and (G)).

context.  Cf. Wieglos, 892 F.2d at 517 ("Materiality is hard to pin

down in the abstract."); In re Donald J. Trump Casino Securities

Litigation, 7 F.3d 357, 369 (3rd Cir.1993), cert. denied, 510 U.S.

1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) ("[M]ateriality is a

relative concept, so that a court must appraise a misrepresentation

or omission in the complete context in which the author conveys

it.").  It is unclear whether UWT had any remaining obligations

under the "settlement agreements" at that time the plaintiffs

invested.  The amount of UWT's debt to Cummings was disclosed in

the Operating Agreement, (Pl.'s Stmt. ¶ 74), and the "2003 UWT

Business Plan" disclosed the fact that UWT's "equity raise" would

be used to repay debt (among other things).  (See UWT Business

Plan, attached as Ex. 5 to Cummings Decl., at 42.)[9]  Of course,

none of this information would have disclosed the existence of

UWT's predecessor entities or the fact that those entities lost

money.  Relatedly, while it is unclear whether Cummings possessed

any material non-public information about Presto Communications'

fraud,[10] it is undisputed that none of the materials the defendants

provided to prospective investors disclosed the fact that Presto

was involved in a joint venture with a predecessor of UWT.  But it

---

[9]  It appears that the "2003 Business Plan" is the "confidential UWT
powerpoint presentation" referred to in the King Plaintiffs' complaint.  (Am.
Compl. ¶ 44.)  At least six of the King Plaintiffs alleged in their complaint
that they received this document.

[10]  Howard's statement to Cummings that Presto's president was "arrested"
is hearsay if offered to show that he was in fact arrested.  (See Cummings Dep.
at 23-24.)  We are not persuaded that Cummings had a duty to disclose the fact
that the was told about an arrest that may or may not have occurred. Moreover,
as we noted previously, there no indication in the record that Jetstream itself
was ever accused of any wrongdoing.

is not clear to us how relevant those previous operations were in late 2004 and early 2005, when plaintiffs invested in the company. The "King Plaintiffs" make no effort to establish the details of any particular plaintiff's investment, or to explain the significance of the omissions at the time that they made those investments. They have not cited any factually analogous cases, or indeed any case in which a court entered summary judgment in a plaintiff's favor on the question of materiality. We conclude that the plaintiffs have not shown that "reasonable minds cannot differ on the question of materiality." See <u>TSC Industries</u>, 426 U.S. at 450.

## **CONCLUSION**

The Elipas Plaintiffs' motion to join (366) is granted. The joint of motion of the Elipas Plaintiffs and the King Plaintiffs for summary judgment (361) is denied. A status hearing is set for April 7, 2010 at 10:30 a.m.


DATE:     March 26, 2010


ENTER:    _____
          John F. Grady, United States District Judge