**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DR. JAMES ELIPAS, *et al.*,          )
                                     )
            Plaintiffs,              )
                                     )
            v.                       )    No. 07 C 3026
                                     )
JAMES K. JEDYNAK, B. GAIL HOWARD,    )
SCOTT H. CUMMINGS, *et al.*,         )
                                     )
            Defendants.              )

<u>**MEMORANDUM OPINION**</u>

Before the court are: (1) the Elipas Plaintiffs' motion for partial summary judgment against defendant Betty Gail Howard; and (2) the Elipas Plaintiffs' and the King Plaintiffs' renewed motions for partial summary judgment against defendant Scott H. Cummings.[1] For the reasons explained below we grant the Elipas Plaintiffs' motion against Howard and grant in part, and deny in part, the plaintiffs' renewed motions for partial summary judgment against Cummings.

---

[1]    The "King Plaintiffs" consist of plaintiffs Brian A. King, Janice Migon, Rosa and Tony Perez, Andrew Bennett, Larry J. Liebovich Living Trust, Ronald Riegelhaupt, David Spinney, Joseph Lanzito, John Ohk, Adam and Dina Skinner, P&P Holdings, Inc. and Claddagh Holdings, Inc. The King Plaintiffs intervened in this lawsuit approximately six months after it was originally filed by the "Elipas Plaintiffs:" James Elipas, Martha Ault, Wayne P. Endre, Katherine H. Endre, JS Squared, LLC, Cuzins Four, LLC, Lewis Carrozza, Ivo Cozzini, John Pavlopoulos, Thomas Pavlopoulos, and Dennis Pavlopoulos.

**BACKGROUND**

On March 26, 2010 we denied the plaintiffs' motions for summary judgment on their Illinois Securities Law claims against Cummings. _Elipas v. Jedynak_, No. 07 C 3026, 2010 WL 1286795, *7 (N.D. Ill. Mar. 26, 2010) (hereinafter, "_Elipas I_").  We will assume that the reader is familiar with that opinion, as well as our opinion granting in part the King Plaintiffs' motion for partial summary judgment against Cummings' co-defendant, Betty Gail Howard.  See _Elipas v. Jedynak_, No. 07 C 3026, 2010 WL 1611024 (N.D. Ill. Apr. 20, 2010) (hereinafter, "_Elipas II_").  At a status hearing on April 14, 2010 we granted plaintiffs' oral request to "supplement" the summary judgment record, and we later gave the Elipas Plaintiffs leave to file a motion for summary judgment against Howard.  These matters are now fully briefed.  But before addressing the plaintiffs' motions, it will be helpful to briefly revisit our previous rulings.

1.  **Elipas I**

Plaintiffs' complaints allege that Unified Worldwide Transport, LLC's ("UWT") offering materials were "riddled with false statements concerning the company's performance." _Elipas I_, 2010 WL 1286795, *5.  But in their original summary judgment motions against Cummings plaintiffs did not seek to prove those false statements.  _Id._  Instead, they relied on two alternative theories.  First, plaintiffs sought to hold Cummings liable as a

"controlling person" for the scheme perpetrated by Cummings' co-defendants, James Jedynak and Howard, whereby certain plaintiffs were induced to pay Jedynak's company (KKJ Holdings) for UWT interests based upon Howard's misrepresentation that KKJ Holdings would remit the proceeds to UWT.  Id. at *3, *5; see also Elipas II, 2010 WL 1611024, *2-4.  Those plaintiffs were misled to believe that they were investing directly in UWT when, in fact, Howard and Jedynak were reselling their own UWT interests and using the proceeds for personal expenses and unrelated investments.  Elipas I, 2010 WL 1286795, *3; Elipas II, 2010 WL 1611024, *2.  We rejected plaintiffs' theory, as applied to Cummings, on two grounds.  First, the plaintiffs failed to establish that they had complied with Illinois Securities Law's notice provision, a necessary element of their rescission claims.  Elipas I, 2010 WL 1286795, *4; see also 815 ILCS 5/13(B).  Second, we concluded that the parties genuinely disputed whether Cummings "acted in concert" with Howard and Jedynak to make the fraudulent sales.  Elipas I, 2010 WL 1286795, *5.  Although Cummings generally supported and encouraged Jedynak's and Howard's fund-raising efforts, we concluded that the after-market sales were different.  Id. at *5 ("The fact that Cummings encouraged Howard and Jedynak to sell interests in UWT does not necessarily show that he even tacitly approved of secondary-market sales that did not benefit him or the company in any way.").

Plaintiffs also attempted to prove that Cummings violated the Illinois Securities Law by failing to disclose information concerning UWT's predecessor entities. Id. at *6. We concluded that those omissions were not "so obviously important to an investor that reasonable minds [could not] differ on the question of materiality." Id. (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)). We based our decision in large part on the plaintiffs' failure to cite relevant authority and to address the omissions in context. Id. ("[I]t is not clear to us how relevant those previous operations were in late 2004 and early 2005, when plaintiffs invested in the company.").

## 2. Elipas II

In Elipas II we partially granted the King Plaintiffs' unopposed motion for summary judgment against Howard, who has invoked her Fifth Amendment privilege against self-incrimination. That motion largely mirrored the theories that the plaintiffs relied on in their motion against Cummings, except that Howard played a direct role in the alleged fraud. We held that the five plaintiffs who paid KKJ Holdings for their UWT interests at Howard's direction were entitled to summary judgment on their Rule 10b-5 claims against her. Elipas II, 2010 WL 1611024, *6.[2] The

2/ Those plaintiffs are Andrew Bennett, Brian King, Joseph Lanzito, Janice Migon, and P&P Holdings. We mistakenly awarded summary judgment to Patrick Shannon, Jr., see Elipas II, 2010 WL 1611024, *6, who was named as a plaintiff in the King Plaintiffs' original complaint but does not appear as a plaintiff in their amended complaint. Shannon is a principal of plaintiff P&P Holdings, and he was acting on that entity's behalf in his interactions with Howard. We denied

same evidence supported those plaintiffs' Illinois Securities Law claims, except that the plaintiffs failed to establish that they had provided the required notice to rescind the sales.  <u>Id.</u> at *5.[3] The remaining plaintiffs paid UWT directly for their interests. <u>Id.</u>  The King Plaintiffs also sought to show that Howard was liable for omitting information about UWT's predecessor entities.  We denied plaintiffs' motion insofar as it was predicated on those omissions for the same reasons we rejected the same argument with respect to Cummings.  <u>Id.</u> at *5.

**<u>DISCUSSION</u>**

**A.   Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  <u>See</u> <u>Pitasi v. Gartner Group, Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999).  "Summary judgment should be denied if the dispute is 'genuine': 'if the

---

plaintiff David Spinney's motion because he failed to show that Howard and/or Jedynak told him that KKJ Holdings would transfer his investment to UWT.  <u>See</u> <u>Elipas II</u>, 2010 WL 1611024, *2 n.4.  Spinney has since submitted an unopposed declaration stating that Jedynak and Howard did make that misrepresentation. (<u>See</u> Spinney Decl. (02/04/2011) ¶ 4.)  On that basis, he is also entitled to judgment on his Rule 10b-5 claim against Howard.

[3]  We gave these plaintiffs leave to file affidavits supporting their assertions that they complied with § 13(B)'s notice requirement.  They have not done so.

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

## B. The Elipas Plaintiffs' Motion for Summary Judgment Against Howard

The "Elipas Plaintiffs" consist of eleven individuals, but evidently only five of those plaintiffs have obtained relief from the stay imposed by Howard's bankruptcy to pursue their claims in this court. (<u>See</u> Elipas Pls.' Mot. for Leave to File Summ. J. Against Betty Gail Howard ¶ 6; <u>see also</u> <u>id.</u> at 2-3 (requesting leave for James Elipas, John Pavlopoulos, Thomas Pavlopoulos, Dennis Pavlopoulos, and Ivo Cozzini to file a summary judgment motion against Howard).)[4] Nevertheless, a § 12(G) violation by Howard is relevant to Cummings' liability as a "controlling person" under the Illinois Securities Law. <u>See</u> 815 ILCS 5/12(G) (making it illegal "[t]o obtain money or property through the sale of securities by means of" material misstatements or omissions); <u>id.</u>

---

[4] The motion itself purports to be brought on behalf of those five plaintiffs plus Wayne and Katherine Endre. But evidently the Endres have not obtained relief from the stay.

at 5/13(A) (making "controlling persons," among others, liable for sales violating the Illinois Securities Law). Therefore, we will address each plaintiffs' claims below, even though fewer than all the plaintiffs are seeking (or are permitted to seek in this case) relief from Howard.

**1.  Rule 10b-5**

Securities and Exchange Commission Rule 10b-5 makes it unlawful: "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b-5. To prevail on their claim against Howard the plaintiffs "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

**a.  Howard's Misrepresentations and Omissions**

Before discussing plaintiffs' evidence in detail, we note that some plaintiffs rely on documents that they received from Jedynak (not Howard) to support their motion for summary judgment. Whether or not Howard kept Jedynak in the dark about the company's actual performance, as he claimed,[5] the undisputed evidence supports the conclusion that Howard was the primary source for the information he conveyed to investors about UWT. Howard was UWT's President and CEO, a member of its two-person executive committee, and by all accounts the individual closest to the company's day-to-day operations. (See King Pls.' Stmt. (Howard) ¶ 9.) UWT's "voice-over-internet-protocol" ("VoIP") business, described in various materials provided to investors, was her brainchild. (Cummings Dep. at 20-22.) Jedynak evidently played no role in the company's operations, and was retained solely to sell securities. (See, e.g., Cummings Dep. at 46-47.) Insofar as the materials he provided to investors were materially false, the evidence supports the conclusion that Howard was responsible for their falsity. Our conclusion is bolstered by the "'inference (permissible in a civil case) of guilt' from her refusal to participate in this litigation on Fifth Amendment grounds." Elipas II, 2010 WL 1611024, *2 (quoting SEC v. Lyttle, 538 F.3d 601, 604 (7th Cir.2008)).

Even if Howard was not primarily liable for the contents of the materials Jedynak distributed to investors, the record amply

---

[5]/ (See Letter from J. Jedynak to "UWT Investors," dated Jan. 23, 2008, attached as Ex. 1 to Elipas Aff.)

supports control person liability under Section 20(a) of the 1934 Exchange Act.[6]  Jedynak was employed as an agent of UWT to sell securities.  (See Cummings Dep. at 46-47; see also Jedynak's Answer to Pls.' Compl. ¶ 16 ("Jedynak further admits that he was employed by UWT during the relevant time period and was authorized to act as its agent.").)  As UWT's President and CEO, and a member of its Executive Committee, Howard controlled UWT.  See 17 C.F.R. § 240.12b-2 ("The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").  Consequently, Howard had direct or indirect power to direct Jedynak's activities, and she has, through her silence, forfeited any good-faith defense she might have had.  See 15 U.S.C. § 78t; see also Lyttle, 538 F.3d at 604.

**(1) James Elipas**

Before making his first $750,000 investment in February 2004 Elipas received an "External Business Forecast" showing a net operating loss of $210,089 during the period June 2003 through

---

[6]    Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C.A. § 78t.

October 2003.  (Elipas Pls.' Stmt. ¶ 9.)  According to plaintiffs'
calculations UWT actually "lost $2,041,431.63" during that time
period.  (See Elipas Pls.' Stmt. of Supp. Facts in Supp. of Mot.
for Summ. J. Against Scott Cummings and Betty Gail Howard
(hereinafter, "Elipas Pls.' Stmt.) ¶ 10.)[7]  Plaintiffs' figure
includes a large "settlement expense," which was non-recurring.
(See Profit & Loss Statement June through October 2003, attached as
Ex. 2 to Collins Aff., at 2.)  Undisclosed expenses not
attributable to the company's operations do not necessarily make
the company's reported operating-income figures misleading.  (For
reasons we will discuss later in this opinion, the decision not to
disclose the "settlement expense" is significant for other
reasons.)  But even if we exclude the settlement expense, UWT's
actual operating losses were significantly higher than reported in
the External Business Forecast.  A reasonable jury could only
conclude that the discrepancy was material.  TSC Industries, Inc.
v. Northway, Inc., 426 U.S. 438, 450 (1976) ("Only if the
established omissions [or misstatements] are so obviously important
to an investor that reasonable minds cannot differ on the question
of materiality is the ultimate issue of materiality appropriately
resolved as a matter of law by summary judgment.") (citations and

---

[7]  Plaintiffs did not retain an accountant to perform this calculation,
but their attorney states that he calculated UWT's actual performance using UWT's
own data and the commercial accounting software that UWT itself used.  (Collins
Aff., attached as Ex. 15 to Elipas Pls.' Stmt., ¶¶ 1-7.)  His calculations are
roughly consistent with the financial statements that an accounting firm reviewed
for UWT in early 2004.  (See Cummings Decl. ¶ 9; Financial Statements (Reviewed),
attached as Ex. 8 to Cummings Decl.)  Cummings has not objected to plaintiffs'
calculations, and Howard has not responded at all.

internal quotation marks omitted).  This is fundamental investing information that — if properly disclosed — would have significantly altered the "total mix of information" available to investors. Rowe v. Maremont Corp., 850 F.2d 1226, 1233 (7th Cir. 1988) (citations and internal quotation marks omitted).

Elipas also received UWT's "Business Plan," dated August 2003, and the company's Amended and Restated Operating Agreement. Plaintiffs renew their argument that these documents improperly omitted information concerning UWT's predecessor entities. We previously concluded that the plaintiffs had not satisfied their burden to show that there was no genuine dispute that the omissions were material.  Elipas I, 2010 WL 1286795, *6; Elipas II, 2010 WL 1611024, *5.  The Elipas Plaintiffs' supplemental materials provide much of the context that was missing from the plaintiffs' original motions.  They also cite for the first time relevant, persuasive authority.  In Securities and Exchange Commission v. Merchant Capital, LLC, 483 F.3d 747, 770-71 (11th Cir. 2007), the defendant did not disclose his personal bankruptcy, which flowed from the failure of a prior business, despite touting his credentials as the former CEO of that business.  The Eleventh Circuit Court of Appeals held that it was clear error for the district court to conclude that the omission was immaterial.  "Knowledge of [the defendant's] previous bankruptcy clearly would have been helpful to a reasonable investor assessing the quality and extent of" his business experience.  Id. at 771.  The Merchant Capital court relied in part

on <u>Securities Exchange Commission v. Carriba Air, Inc.</u>, 681 F.2d 1318 (11th Cir. 1982), which is more directly pertinent to this case. There, the defendant formed a commuter airline business one month after his previous commuter airline endeavor went bankrupt. <u>Id.</u> at 1320. Despite the similarity of the two businesses, and the fact that they employed "virtually all" the same principals, the defendants did not fully disclose the prior business's failure in the new company's prospectus. <u>Id.</u>; <u>see also</u> <u>id.</u> at 1323. In affirming the district court's decision granting the SEC's preliminary injunction motion, the court held that "there can be no doubt of the materiality of the errors and omissions in the prospectus." <u>Id.</u> at 1324.

We now conclude that the Business Plan omitted material information. As in <u>Carriba Air</u>, UWT and its predecessors were engaged in the same business. Howard was the driving force behind, and Cummings was a substantial investor in, both companies. The predecessor entities lost money, <u>see</u> <u>Elipas I</u>, 2010 WL 1286795, *1, but the Business Plan does not discuss or even mention them. Instead, the document refers repeatedly to Howard's previous and purportedly successful company, "Northstar." These statements create the false impression that Northstar was Howard's most recent experience relevant to the VoIP business. Moreover, UWT had continuing obligations stemming from the predecessor entities' activities. First, UWT executed "settlement agreements" with investors in those entities in July 2003, before the date of the

Business Plan.[8]   The fact that UWT's principals believed that disgruntled investors in the predecessor entities might sue UWT would be important to prospective investors in the new company. And whether or not the proceeds of plaintiffs' investments were actually used to fund those settlement agreements, it is undisputed that Cummings and Howard contemplated that they would be used for that purpose.  (Cummings Decl. ¶ 9.)  Second, although the Business Plan states that "debt repayment" was one of the reasons UWT was seeking new investors, it did not disclose that the debt included loans that Cummings made to UWT's predecessor entities, which UWT assumed after it was formed.  (See Business Plan at 42; Cummings Decl. ¶ 5 (stating that the predecessor entities' debt to Cummings was "consolidated into UWT up on the expressed advice of counsel at Loeb & Loeb").)  The Business Plan creates the impression that UWT was a start-up company, which was only partially true.   It was formed in June 2003, but it carried on a business started before that time.

---

[8]/  Cummings' declaration is vague about the timing of these agreements — he refers, for example, to a draft letter UWT's in-house counsel sent to him in November 2003.  (Cummings Decl. ¶ 9; Email from R. Sherman to S. Cummings, dated November 18, 2003, attached as Ex. 7 to Cummings Decl.; see also Cummings Dep. at 29 ("The settlement agreement was drafted and, I believe, completed sometime in late 2003.").)   That letter, which gave investors in UWT's predecessor entities the opportunity to purchase equity in UWT, refers to preexisting "repayment" agreements.  (See Email from R. Sherman to Cummings, dated November 18, 2003, attached as Ex. 7 to Cummings Decl. (attaching the "UWT Opportunity Letter".)  Those "repayment" agreements are evidently the "settlement agreements" discussed in UWT's Executive Committee Minutes and its reviewed Financial Statements.  (See Executive Committee Minutes, dated Jan. 8, 2004, attached as Ex. 38 to King Pls.' Rule 56.1 Stmt. (DKT #362), at "Topic 5;" Financial Statements (Reviewed), attached as Ex. 8 to Cummings Decl., at 6.)   Those documents indicate that the settlement or "repayment" agreements were executed in July 2003.  (See also UWT Capitalization Table, attached as Ex. 1 to Cummings Decl., at 1 (showing "Settlement Liability" to investors in UWT's predecessor entities as of July 31, 2003).)

The Amended and Restated Operating Agreement does not describe the company's history, nor would one expect a document of this kind to do so. But in the absence of some other document or statement disclosing the predecessor entities' existence, the "Holder Loans" disclosure in § 3.7 is misleading. (Amended and Restated Operating Agreement, dated Oct. 31, 2003, § 3.7.) Section 3.7 indicates that the Cummings Family Loving Trust and Agile Partners LP (Cummings' hedge fund) had loaned money "to the Company." (Id.) Cummings' loans to UWT's predecessor entities account for some or all of the outstanding balance of those loans ($1,712,429 "as of July 1, 2003"). (Id.) But that fact was not disclosed to Elipas and other investors.

Elipas made a second investment in UWT on December 8, 2004 in the amount of $600,000. (Elipas Aff. ¶ 28.) Prior to that investment he received more materials from Howard and Jedynak indicating that the company was profitable and predicting continued success: (1) a UWT "Corporate Profile: Executive Summary," dated October 2004; (2) a "Confidential Presentation," dated November 2004; and (3) a "Condensed Profit and Loss Statement" purporting to show actual figures for January through September 2004, and projected figures for the balance of the year. (Elipas Aff. ¶¶ 30-35.) Like the Business Plan, the Corporate Profile and the Confidential Presentation tout Howard's success with Northstar, and draw an even more direct connection between that company and UWT. (See Corporate Profile, dated October 2004, attached as Ex. 11 to

Elipas Aff. (Howard "is replicating her prior successful international telecom service business, NorthStar, which, as President/CEO, Ms. Howard sold in 2001 for a significant ROI."); Confidential Presentation, dated November 2004, attached as Ex. 12 to Elipas Aff. ("Ms. Howard was President and CEO of Northstar, a $3 million startup, which in four years was sold for $340 million in 2001.").) Neither the Corporate Profile, nor the Confidential Presentation, disclosed Howard's more recent experience with UWT's predecessor entities. The Condensed Profit and Loss Statement shows net operating income of approximately $797,000 for the first nine months of 2004. The Elipas Plaintiffs calculate a net loss of $235,931.24 for the same period based on financial records obtained in discovery. (See Corrections to Collins Aff. ¶ 1-2.) A significant portion of the loss that plaintiffs calculate is depreciation and interest. The existence of those expenses does not necessarily make the disclosed figures for "operating income" misleading. That said, even if we exclude those expenses the Condensed Profit and Loss Statement significantly overstated operating income. (Id. at Ex. 10 (showing $193,115.52 of "ordinary income" for the period January to September 2010, compared with the $797,000 of "operating income" disclosed in the Condensed Profit and Loss Statement).[9]

_____

[9] Plaintiffs argue that UWT's actual losses were much higher, citing purportedly fictitious income entries in 2005. (Corrections to Collins Aff. ¶ 2.) While those entries may be questionable, plaintiffs have not cited any evidence indicating that the Condensed Profit and Loss Statement — which purports to show actual figures for 2004 — includes fictitious income.

Jedynak told Elipas that he had not received any distributions from UWT, despite its success, because the company was reinvesting in its network. (Elipas Aff. ¶ 29.) That representation is echoed in the Corporate Profile. (Corporate Profile, dated Oct. 2004, at 7 (stating that the company was placing revenues in a reserve account "to be reinvested to expand UWT's global VoIP network," among other uses).) And it also appears in a letter that Howard sent to Elipas, dated November 23, 2004, enclosing a distribution check of $3,806.00. (Letter from Howard to Elipas, dated Nov. 23, 2004, attached as Ex. 10 to Elipas Aff. (touting UWT's "substantially" increased infrastructure).) In 2007 Howard listed more than $18 million of personal property on UWT's bankruptcy schedules, including equipment and licenses; UWT's creditors have been able to locate only $9,000 worth of used equipment. (Elipas Pls.' Stmt. ¶ 8.) Given the amount of time that elapsed between Elipas' second investment and UWT's bankruptcy, it is possible that Jedynak's and Howard's statements were true in 2004. But viewing the scheme as a whole, that possibility seems unlikely.

Also prior to Elipas' second investment Jedynak and Howard told Elipas that UWT had signed a "lucrative contract with Caterpillar." (Elipas Pls.' Stmt. ¶ 15.) Howard later claimed that Caterpillar owed UWT approximately $10 million for VoIP services. (Trans. of Howard's Testimony at 341(a) Hearing, attached as Ex. 16 to Elipas Pls.' Stmt., at 55-56.) Caterpillar has no record of any dealings with UWT whatsoever. (Anderson Aff.,

attached as Ex. 12 to Elipas Pls.' Stmt., ¶¶ 2-4 (sworn statement of Caterpillar's Payables Section Manager).) A document purporting to assign a VoIP contract between Caterpillar and another entity to UWT is evidently a forgery. (Banwart Aff., attached as Ex. 11 to Elipas Pls.' Stmt., ¶¶ 2-6 (sworn statement of a Caterpillar executive stating that he did not sign, nor did he authorize anyone else to sign, the assignment that purports to bear his signature).) The existence of a contract with a major customer would be important to a reasonable investor. Besides the revenue generated by the contract, a relationship with a large, established corporation like Caterpillar would be seen as a sign that UWT was itself successful and dependable.

### (b) John, Thomas, and Dennis Pavlopoulos

John Pavlopoulos purchased UWT interests on January 31, 2004 for $250,000, with a check payable to UWT. (T. Pavlopoulos Aff. (05/04/2010), attached as Ex. 2 to Elipas Pls.' Stmt., ¶ 6.)[10] Before doing so the Pavlopouloses received from Jedynak the same External Business Forecast that Jedynak had given Elipas. (Id.) As we previously discussed, that document materially misstated UWT's actual losses. Thomas Pavlopoulos purchased UWT interests from KOR Venture, LLC for $100,000 in August 2004. (T. Pavlopoulos Aff. (02/28/2009), attached as Ex. 16 to King Pls.' Mot. for

---

[10]/ Thomas Pavlopoulos, the affiant, is John Pavlopoulos' son. (T. Pavlopoulos Aff. ¶ 6.) He states in his affidavit that he, his father, and his brother Dennis each received materials from Howard and Jedynak concerning UWT. (See, e.g., id. at ¶¶ 6-10, 14-16.)

Partial Summ. J. Against Howard, ¶ 4.)[11]  By that time, Kellogg &
Andelson had completed its review of UWT's financials, which showed
a $2.9 million loss for the period ending December 31, 2003.  No
one disclosed that information to the Pavlopouloses.  (T.
Pavlopoulos Aff. (05/04/2010) ¶ 15.)  Instead, Jedynak and Howard
continued to tell them that UWT was profitable, even though
expenses continued to exceed revenues during the first seven months
of 2004.  (T. Pavlopoulos Aff. (05/04/2010) ¶ 17; Corrections to
Aff. of Michael R. Collins, ¶ 1 (UWT's financial records show a
loss of $334,760.89 for the period January 1, 2004 through July 31,
2004, taking into account depreciation and interest expenses).).

In April 2005 John Pavlopoulos wired $125,000 to KKJ Holdings,
LLC, which included his own $75,000 investment and his son Dennis's
$50,000 investment.  (J. Pavlopoulos Aff. (02/28/2009), attached as
Ex. 15 to the King Plaintiffs' Rule 56.1 Stmt. (DKT # 382), ¶ 4; D.
Pavlopoulos Aff. (02/28/2009), attached as Ex. 17 to the King
Plaintiffs' Rule 56.1 Stmt. (DKT # 382), ¶ 4.)  Thomas separately
purchased additional UWT interests for $75,000 that same month,
also by payment to KKJ Holdings.  (T. Pavlopoulos Aff.
(02/28/2009), attached as Ex. 16, ¶ 4.)  Jedynak misrepresented
that those payments would be forwarded to UWT.  (T. Pavlopoulos
Aff. (05/04/2010) ¶¶ 26-27)); see Elipas II, 2010 WL 1611024, *2

---

[11] "The private right of action under Section 10(b) and Rule 10b-5 reaches
beyond statements and omissions made in a registration statement or prospectus
or in connection with an initial distribution of securities and creates liability
for false or misleading statements or omissions of material fact that affect
trading on the secondary market."  In re Burlington Coat Factory Securities
Litigation, 114 F.3d 1410, 1417 (3d Cir. 1997) (footnote omitted).

("A reasonable investor would consider it important that his or her investment would be used for the personal expenses and investments of the company's agents, and not to fund the company's operations."). Jedynak and Howard also touted UWT's nonexistent relationship with Caterpillar. (T. Pavlopoulos Aff. (05/04/2010) ¶ 21 (stating that Jedynak and Howard told the Pavlopouloses and other investors that Caterpillar was a "huge customer of UWT," had given UWT "$5,000,000 in equipment to use," and was "bringing $4,000,000 per month in revenue to UWT").)

### (c) Ivo Cozzini

Cozzini purchased UWT securities in January and April 2005 for $200,000 total. (Elipas Pls.' Stmt. ¶¶ 36-38.) He paid KKJ Holdings at Jedynak's and Howard's direction, both of whom misrepresented that KKJ Holdings would transmit the money to UWT. (Id. at ¶ 38; see also Cozzini Aff. (10/04/2009) at 1-2 (stating that in connection with each investment he received a letter from Howard reassuring him that KKJ Holdings would transmit the money to UWT).) Prior to his April 2005 investment, Howard and Jedynak also told Cozzini about the "lucrative" (but nonexistent) Caterpillar deal. (Elipas Pls.' Stmt. ¶ 3.) Cozzini also received the Corporate Profile, the Confidential Presentation, the Amended and Restated Operating Agreement, and the Condensed Profit and Loss Statement. (Cozzini Aff. "#2" ¶¶ 6-7.) Those documents, too, were materially misleading. See supra.

### (d) JS Squared, LLC and Cuzins Four, LLC

JS Squared purchased UWT interests on January 5, 2005 ($25,000 payment to UWT) and February 5, 2005 ($25,000 payment to KKJ Holdings); Cuzins Four purchased UWT interests on February 5, 2005 ($25,000 payment to UWT).[12] (Elipas Pls.' Stmt. ¶ 27.) JS Squared and Cuzins Four received from Jedynak the Corporate Profile, the Confidential Presentation, the Amended and Restated Operating Agreement, and the Condensed Profit and Loss Statement. (Miceli Aff. ¶ 7); see supra.

### (e) Katherine and Wayne Endre

Katherine and Wayne Endre separately purchased UWT securities in February 2005, for $100,000 and $200,000 respectively. (Aff. of K. Endre, attached as Tab 5 to Elipas Pls.' Stmt., ¶ 2; Aff. of W. Endre, attached as Tab 6 to Elipas Pls.' Stmt., ¶ 3.) Jedynak told the Endres that Caterpillar was a large UWT customer. (FBI Questionnaire, attached as Ex. 1 to Aff. of K. Endre, ¶ 12 (Jedynak told the Endres that Howard "had brought in Caterpillar and other big names in industry"); FBI Questionnaire, attached as Ex. 1 to Aff. of W. Endre, ¶ 21 ("Caterpillar was a huge selling point. He said Caterpillar was on board and currently their largest customer.").) The Endres also received the Corporate Profile, the Confidential Presentation, and the Amended and Restated Operating Agreement. (K. Endre Aff. ¶ 4; W. Endre ¶ 4); see supra.

### (f) Lewis Carrozza

---

[12]/ JS Squared and Cuzins Four have a common manager, Jerry Miceli. (Miceli Aff. ¶ 2.)

Lewis Carrozza purchased UWT securities in January 2005 for $100,000 with a check payable to KKJ Holdings at Jedynak's and Howard's direction. (Carrozza Aff., attached as Tab 7 to Elipas Pls.' Aff., ¶ 2.) Howard falsely represented that the proceeds of Carrozza's investment would be transferred "[u]pon receipt" to UWT. (Id.; see also Letter from G. Howard to L. Carrozza, dated Jan. 7, 2005, attached as Ex. 2 to Aff. of L. Carrozza.) Carrozza also received the Corporate Profile and the Amended and Restated Operating Agreement. (Carrozza Aff. ¶ 4.)

### (g) Martha Ault

Martha Ault purchased UWT securities for $200,000 in January 2005. (Elipas Pls.' Stmt. ¶ 25.) Unlike her co-investors, Martha Ault did not receive any documents in conjunction with her investment. Indeed, she states in her FBI questionnaire that she had "no idea" what UWT was. She invested based only on Jedynak's representation that she "would make a lot of money." (FBI Questionnaire, attached as Ex. 1 to Aff. of M. Ault, ¶ 4.) Vague optimism about a company's prospects is not actionable. Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b-5."). And plaintiffs have not articulated any other basis to require defendants to disclose non-public information about the company. See Gallagher v. Abbott Laboratories, 269 F.3d 806, 808-09 (7th Cir. 2001) ("[F]irms are entitled to keep silent (about good news as well as bad news)

unless positive law creates a duty to disclose."). We conclude that Ault has not proven a material false statement or omission.

**b.  Scienter**

Plaintiffs must prove that Howard made the misrepresentations with the "intent to deceive, demonstrated by knowledge of the statement[s]' falsity or reckless disregard of a substantial risk that the statement[s] [were] false." Higginbotham v. Baxter Intern., Inc., 495 F.3d 753, 757 (7th Cir.2007). Scienter may be proven by circumstantial evidence, and we may also consider the "'inference (permissible in a civil case) of guilt' from her refusal to participate in this litigation on Fifth Amendment grounds." Elipas II, 2010 WL 1611024, *2 (quoting SEC v. Lyttle, 538 F.3d 601, 604 (7th Cir. 2008). The evidence supports the conclusion that Howard: (1) approved of, and participated in, the scheme to divert payments intended for UWT; (2) knew that UWT was losing money even as she and Jedynak told investors that the company was very profitable; (3) knew that the company was not investing in infrastructure to expand is VoIP business; and (4) deliberately fabricated UWT's contract with Caterpillar.

**d.  Connection to the Sale of Securities**

To establish a "connection" between the omissions and misrepresentations and the sale of securities "[i]t is enough that the scheme to defraud and the sale of securities coincide." SEC v. Zandford, 535 U.S. 813, 822 (2002). Howard's and Jedynak's misrepresentations and omissions were an integral part of their

efforts to solicit investments.  The "scheme" was designed to sell securities.

**e.    Reliance and Transaction Causation**

The record supports plaintiffs' contention that they relied on Howard's misrepresentations and omissions before investing in UWT. (Elipas Pls.' Stmt. ¶¶ 44-45.)  Cummings contends that Elipas did not rely on any of the offering materials, citing a portion of Elipas' deposition where he states that he relied on Jedynak's recommendation.  (See Elipas Dep., attached as Ex. 6-E to Cummings Decl., at 17.)  But there is no dispute that Elipas received the documents in question, and he states in his affidavit that he relied on them in deciding to invest.  (Elipas Aff. ¶ 7.)  We do not think that the purported discrepancy between his affidavit and his deposition testimony creates a genuine dispute of material fact.  It is a reasonable inference that each plaintiff relied at least in part on Jedynak's and/or Howard's "recommendation."  That does not mean that they did not also rely on the misleading materials underlying their sales pitch.

To show transaction causation the plaintiff must provide "proof that a knowledgeable investor would not have made the investment in question, had she known all the facts." Ray v. Citigroup Global Markets, Inc., 482 F.3d 991, 995 (7th Cir.2007). The plaintiffs plausibly state that they would not have invested in UWT but for Howard's misrepresentations and omissions.  (Elipas Pls.' Stmt. ¶¶ 44-45.)  Neither Howard nor Cummings has cited any

evidence that would give us a reason to disbelieve plaintiffs' testimony.

**f.    Economic Loss and Loss Causation**

When UWT entered bankruptcy in June 2007, plaintiffs' interests were worthless. <u>Elipas II</u>, 2010 WL 1611024, *3. Except for a few small distributions, plaintiffs lost their entire investments. <u>Id.</u> We conclude that plaintiffs have shown economic loss. <u>Id.</u> We previously held that Howard's and Jedynak's scheme to divert funds intended for UWT was a substantial factor in UWT's demise. <u>Id.</u>; <u>see also</u> <u>Miller v. Asensio & Co., Inc.</u>, 364 F.3d 223, 231-32 (4th Cir.2004) (a plaintiff proves Rule 10b-5 liability by showing that the defendant's fraud was a substantial cause of plaintiff's losses, even if it was not the sole cause); <u>Caremark, Inc. v. Coram Healthcare Corp.</u>, 113 F.3d 645, 649 (7th Cir.1997) (a plaintiff may adequately plead loss causation without alleging "that all of its loss can be attributed to the false statement of the defendant"). And if UWT had been as profitable as Howard and Jedynak had represented it to be, it is reasonable to infer that plaintiffs would have received some return on their investments. <u>See</u> <u>LHLC Corp. v. Cluett, Peabody & Co., Inc.</u>, 842 F.2d 928, 931 (7th Cir.1988) ("'Loss causation' means that the investor would not have suffered a loss if the facts were what he believed them to be."). It is ordinarily the plaintiff's burden to isolate the effects of fraud from other factors that may have contributed to the loss. <u>Id.</u> Here, Howard's decision not to participate in the

litigation in any meaningful way complicates an already difficult task. Id. Under these circumstances, we will again "shift the burden to Howard to show that other factors besides her fraud contributed to UWT's demise." Elipas II, 2010 WL 1611024, *4. Because "there is no evidence in the record that would support a finding that some other factor besides Howard's fraud contributed to plaintiffs' losses," we conclude that Howard's fraud was the sole cause of those losses. Id. The appropriate measure of damages is the amount of plaintiffs' investment less any distributions they may have received.

In sum, we conclude that Elipas, the Pavlopouloses, and Cozzini are entitled to summary judgment on their Rule 10b-5 claims against Howard. JS Squared, LLC, Cuzins Four, LLC, Katherine Endre, Wayne Endre, and Lewis Carrozza have proven a 10b-5 violation, although they are not entitled to a judgment against Howard while the bankruptcy stay remains in place. We conclude that Martha Ault, who also has not obtained relief from the bankruptcy stay, did not rely on a material misstatement or omission.

### 2. Illinois Securities Law

Plaintiffs allege that the defendants have violated Illinois Securities Law § 12(G), making it illegal "[t]o obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading." 815 ILCS 5/12(G). The elements of a § 12(G) claim mirror the elements of a Rule 10b-5 claim, except that the plaintiff is not required to prove scienter (<u>see</u> <u>Foster v. Alex</u>, 572 N.E.2d 1242, 1245 (Ill. App. 1991)) and loss causation (<u>see</u> <u>Lucas v. Downtown Greenville Investors L.P.</u>, 671 N.E.2d 389, 398-400 (Ill. App. 1996)). It follows from our conclusion that Howard violated Rule 10b-5 that she also violated § 12(G).

A plaintiff who proves a violation of the Illinois Securities Law is entitled to rescind the securities sale and recover the purchase price from,

> the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made . . . and in case the issuer, controlling person, underwriter or dealer is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated in making the sale.

815 ILCS 5/13(A). Howard was a "controlling person," a "person by or on behalf of whom said sale was made," and an officer of the issuer who "participated in making the sale." Plaintiffs were also required to notify Howard of their intention to rescind within 6 months after learning that the sale was voidable. <u>Id.</u> at § 13(B). Illinois courts have held that "the time for notice begins to run not from the time of knowledge of the underlying facts, but rather from the time of knowledge that those facts give rise to a right of rescission." <u>Reshal Associates, Inc. v. Long Grove Trading Co.</u>, 754 F.Supp. 1226, 1236 (N.D.Ill. 1990) (collecting cases). The

Pavlopouloses learned for the first time in early 2007 that UWT was in serious financial trouble, despite Howard's and Jedynak's assurances that the company was very profitable. They contacted their attorney in March 2007, who conducted a preliminary investigation. Their attorney states that he then concluded that his clients had been defrauded, and sent a notice to Howard rescinding the Pavlopouloses' purchases on April 12, 2007. The Pavlopouloses referred Elipas and Cozzini to their attorney in May 2007, who sent rescission notices on their behalf to Howard on May 22, 2007. The notices were sent within six months after plaintiffs learned that they had a right to rescind their purchases. The Pavlopouloses, Elipas, and Cozzini are entitled to rescission against Howard.

## C. The Elipas and King Plaintiffs' Renewed Motions for Summary Judgment Against Scott Cummings

In their previous motions against Cummings plaintiffs asked us to decide fact-intensive questions in a virtual vacuum. See Elipas I, 2010 WL 1286795, *6. As we have just discussed, we now have a better sense for the context in which the defendants' made their misstatements and omissions. Cummings generally responds by denying that he knew what Jedynak and Howard were telling investors. For the reasons explained below, we do not think this is sufficient to defeat summary judgment with respect to at least some of the challenged investments.

### 1. Violations of Rule 12(G)

We have already held that the Elipas Plaintiffs (except Martha Ault) have established § 12(G) violations.  In <u>Elipas I</u> held that the sales to Andrew Bennett, Brian King, Joseph Lanzito, Janice Migon, and P&P Holdings violated § 12(G) based on the KKJ Holdings fraud.  In light of our ruling with respect to UWT's predecessor entities, those plaintiffs have also established § 12(G) violations based on the defendants' failure to disclose information about those entities.  (<u>See</u> A. Bennett Decl. (01/18/11) ¶¶ 3-6; B. King Decl. (01/19/11) ¶¶ 3-6; J. Lanzito Decl. (01/18/11) ¶¶ 3-6; J. Migon Decl. (01/23/11) ¶¶ 3-6; P. Shannon Jr. Decl. (01/20/11) ¶¶ 4-7).)  For the same reason, the remaining King Plaintiffs, whose motions we denied because they were not predicated on the KKJ Holdings fraud, have also established § 12(G) violations.  (<u>See</u> L. Liebovich (01/19/11) ¶¶ 3-6; J. Ohk Decl. (01/26/11) ¶¶ 3-6; T. Perez Decl. (01/26/11) ¶¶ 3-6; P. Shannon Sr. Decl. (01/__/11) ¶¶ 4-7; A. Skinner and D. Skinner Decl. (01/27/11) ¶¶ 3-6; R. Riegelhaupt Decl. (01/__/11) ¶¶ 3-6; D. Spinney Decl. (02/04/11) ¶¶ 6, 8, 13-16.).)

**2.  Control Person Liability**

Section 13(A) of the Illinois Securities Law provides that "controlling person[s]" are liable to purchasers for sales that violate the Law.  815 ILCS 5/13(A).  "In case of unincorporated issuers" — UWT is a limited liability company — "'controlling person' means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security,

who directly or indirectly controls the activities of the issuer."
815 ILCS 5/2.4.  As one half of UWT's executive committee, which
had "sole and complete charge and management of all the business
and affairs of the Company, in all respects and all matters,"
(Amend. and Restated Operating Agreement of UWT, attached as Ex. 7
to Elipas Aff., at §§ 6.1.1 and 6.1.4), we conclude that Cummings
"control[led] the activities of the issuer."  <u>See also</u> <u>Elipas I</u>,
2010 WL 1286795, *5.  There is no evidence that Cummings himself
offered or sold UWT securities to the plaintiffs.  Therefore, his
liability as a "controlling person" turns on whether he was part of
the "group of persons acting in concert" to sell UWT securities.
"While overt action by a member of a controlling group would not
always be required, there must be some showing of assent, approval
or concurrence, albeit tacit approval, in the action of the group
in selling securities, before an individual will be held liable for
the actions of the controlling group."  <u>Froehlich v. Matz</u>, 417
N.E.2d 183, 190 (Ill. App. 1981).

The plaintiffs in <u>Froelich</u> sought to hold defendants Conrad
Matz and George Froelich liable as controlling persons for the sale
of unregistered securities.  <u>Id.</u> at 187-88.[13]  Matz gave one of the
issuer's promoters the idea for the issuer's business, in exchange
for which the promoter issued stock in the new company to Matz.
<u>Id.</u> at 185.  But he did so without Matz's knowledge.  <u>Id.</u>  By the

---

[13]/  A third individual, Carolyn Buchanan, was also sued as an alleged
controlling person.  The facts surrounding the verdict in her favor are not
relevant to this lawsuit.

time that Matz learned that he owned shares in the company — over a year later — the company had sold unregistered securities to the plaintiffs. Id. at 190. The court reasoned that to hold Matz liable under these circumstances would, in effect, eliminate the "in concert" requirement from the statute. Id. ("A person is not liable merely because one can add his shareholdings onto the holdings of a controlling group and they still remain a controlling group."). The plaintiff must show that the defendant had "[s]ome connection with the sale, or decision to sell, securities." Id. Matz had nothing to do with the challenged sales. By contrast, the court found that Froehlich — a stockholder and director of the company — was a controlling person. Id. at 193-94. Froelich agreed with the decision to seek new investors, and he and the company's other principals agreed that the proceeds would be used to repurchase some of Froelich's stock. Id. at 194. "[B]y Froehlich's concurrence in the decision to sell stock to others, Froehlich acted in concert with [the company's other principals] in the sale of securities" to the plaintiffs. Id.

As we indicated in Elipas I, the undisputed evidence supports the conclusion that Cummings was "connected" with the sale, or the decision to sell, new equity in the company. Elipas I, 2010 WL 1286795, *5. In 2003 and 2004 UWT's Executive Committee — Howard and Cummings — decided to seek new investors. (Cummings Decl. ¶¶ 7-9, 17.); see Froehlich, 417 N.E.2d at 194 (concluding that the evidence supported the trial court's conclusion that the defendant

"agreed . . . that new investors should be brought into the corporation if possible."). That decision was driven, in part, by their desire to pay down debt that UWT owed to Cummings (some portion of which consisted of loans to UWT's predecessor entities). See Froehlich, 417 N.E.2d at 194 (the sale to new investors "was done with the purpose, in part, of repurchasing Froehlich's shares, and thereby permitting him to recoup part of his imperiled investment."). It is not a defense that Cummings did not sell UWT securities, or that he did not know specifically to whom Howard and Jedynak were selling them. See id., 417 N.E.2d at 194 ("That [Froelich] had no specific knowledge of the individuals solicited, or that he did not solicit them, does not remove or negate his active participation and encouragement in the decision to seek other investment."). Nor do we believe that plaintiffs must show that Cummings knew specifically what Howard and Jedynak were telling investors (although he would have known that the Business Plan and the Amended and Restated Operating Agreement did not mention UWT's predecessor entities, see Cummings Decl. ¶ 8.). The federal Securities Act, on which the Illinois Securities Law was modeled (see Foster, 572 N.E.2d at 1244-45), provides that a controlling person is not liable if he or she "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. There is no comparable language in the Illinois Securities Law, and Cummings has not cited (nor are we

aware of any) authorities that would support reading such a defense into the statute. Cummings controlled UWT, and approved and encouraged sales of UWT securities to new investors. Therefore, he is liable as a controlling person for the fraudulent sales of new UWT securities to the plaintiffs. The following plaintiffs, all of whom have complied with § 13(A)'s notice requirement, are entitled to rescind the purchases that they made directly from UWT and recover the purchase price from Cummings (less distributions): Brian King, Rosa and Tony Perez, Larry J. Liebovich Living Trust, Ronald Riegelhaupt, John Ohk, Adam and Dana Skinner, James Elipas, Wayne Endre, Katherine Endre, Cuzins Four, LLC, Joseph Lanzito, JS Squared, LLC, and John Pavlopoulos. See Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc., 313 F.3d 385, 391 (7th Cir. 2002) ("Rule 56(d) [now Rule 56(g)] of the civil rules is explicit in allowing the judge to grant summary judgment on less than the plaintiff's whole claim."). Thomas Pavlopoulos relied on Howard's and Jedynak's false statements and material omissions when he purchased UWT units from KOR Venture. Cummings, as a member of UWT's Executive Committee, approved this sale. (Cummings' Resp. to Elipas Pls.' Stmt. ¶ 21.) Where, as here, the controlling person retains and exercises the authority to approve after-market sales, we think liability is appropriate. See Olczyk v. Cerion Tech., Inc., 721 N.E.2d 732, 744-45 (Ill. App. 1999) (holding that the issuer, its officers and directors, and other defendants could be

held liable for after-market sales traceable to a materially false prospectus).

The remaining purchases involve payments to KKJ Holdings for Howard's and Jedynak's own securities. In <u>Elipas I</u> we drew a distinction between these sales and direct sales of UWT securities. <u>Elipas I</u>, 2010 WL 1286795, *5. First, sales by existing interest holders required Executive Committee approval under the terms of UWT's Amended and Restated Operating Agreement. Cummings denies that the Committee approved the sales, and the plaintiffs have not cited any contrary evidence. In their supplemental materials three plaintiffs point out that they executed a subscription agreement with UWT, not KKJ Holdings, Jedynak, or Howard. (<u>See</u> Miceli Aff. ¶ 6; Carrozza Aff. ¶ 3; Cozzini Aff. "#3" ¶ 3.) This was part of Howard's and Jedynak's scheme — they told investors that they were investing directly in UWT, when in reality Howard and Jedynak were selling for their own account. It does not establish that Cummings approved of these sales. Second, we concluded that Cummings did not benefit when Howard and Jedynak sold their own securities. Plaintiffs also dispute this conclusion, citing a letter agreement that Cummings entered into with UWT in October 2005. Pursuant to the agreement, UWT "loaned" Cummings $400,000 interest free in exchange for his agreement to sell stock in the company "to one or more interested outside investors that have been aggregated by Jim Jedynak in the past several months and of whom you [Howard] and I [Cummings] are aware and approve." (Letter Agreement, dated

October 28, 2005, attached as Ex. 20 to Cummings Decl.)  The parties later revised the agreement, but the terms remained substantially the same.  It is undisputed that Cummings did not sell any stock in connection with these agreements and that he kept the $400,000.  Plaintiffs further contend that, although UWT is ostensibly a party to the letter agreement, Cummings actually received the $400,000 from Jedynak or KKJ Holdings and that the payment included "some portion" of the money that plaintiff David Spinney paid to KKJ Holdings in August 2005 for UWT securities.  (See King Pls.' Supp. Stmt. ¶¶ 1, 3, 5-13.)  The record is muddled on this point, but it appears that Jedynak withdrew $400,000 from KKJ Holdings' bank account, transmitted the funds to UWT, which in turn wired the funds to Cummings' bank account.

Even if we assume that the money Cummings received included some of Spinney's co-mingled funds, that does not necessarily show that Cummings approved the sale to Spinney (or any other after-market sales to the plaintiffs).  A reasonable jury, considering all the evidence, could conclude otherwise.[14]  Plaintiffs ask us to infer that the option agreement was a sham transaction designed to funnel the proceeds of Jedynak's and Howard's fraud to Cummings.  (King Pls.' Supp. Mem. at 7.)  But as the moving parties, they are not entitled to that inference.  See Pitasi, 184 F.3d at 714.

---

[14]/  The fact that Cummings reviewed the Business Plan and the Amended and Restated Operating Agreement, and that Jedynak and Howard used those documents to sell their own UWT interests, is one piece of evidence that a jury may consider to determine whether Cummings "tacitly" approved the sales.  (Cf. King Pls.' Mem. at 9.)  But we are not persuaded that it entitles the plaintiffs to summary judgment.

**CONCLUSION**

The Elipas Plaintiffs' motion for summary judgment against Betty Gail Howard (407) is granted. In light of the plaintiffs' supplemental materials, our order denying their joint of motion for partial summary judgment against Cummings (393) is vacated. Their joint motion for partial summary judgment (361) is granted in part and denied in part as to liability. The motion is granted as to the following plaintiffs with respect to securities that they purchased from UWT directly: Rosa and Tony Perez, Larry J. Liebovich Living Trust, Ronald Riegelhaupt, John Ohk, Adam and Dana Skinner, James Elipas, Wayne Endre, Katherine Endre, Cuzins Four, LLC, Joseph Lanzito, JS Squared, LLC, and John Pavlopoulos. The motion is also granted as to Thomas Pavlopoulos with respect to the securities he purchased from KOR Venture, LLC. The motion is denied as to the remaining securities purchases. A status hearing is set for May 18, 2011 at 10:30 a.m.


DATE:     May 5, 2011



ENTER:    _____

          John F. Grady, United States District Judge